HOOD, Judge.
Mid-South Contractors, Inc., instituted this suit to recover the profits it allegedly would have received under a contract entered into with defendant, J. E. Ratcliff, had plaintiff been permitted to complete the contract. Defendant Ratcliff filed a *377 reconventional demand seeking to recover damages for an alleged breach of contract by plaintiff. Judgment was rendered by the trial court in favor of defendant, rejecting plaintiff’s demands and condemning Mid-South to pay to Ratcliff the sum of $12,610.20 as damages. Plaintiff Mid-South appealed.
The issues presented are (1) whether the trial court erred in refusing to grant plaintiff a continuance, and (2) whether Mid-South breached its subcontract with Ratcliff.
In November, 1972, the Rapides Parish School Board awarded a contract to defendant Ratcliff, a general contractor, to renovate the Boyce High School. Ratcliff then entered into a subcontract with Mid-South, under the terms of which the latter agreed to do the painting work on the project, pursuant to plans and specifications prepared by the architects, for a contract price of $16,490.00.
The subcontract entered into between the parties was evidenced by a letter from Mid-South to Ratcliff dated November 24, 1972, submitting a bid for the painting work, and a letter from Ratcliff to Mid-South, dated December 20, 1972, in which defendant accepted plaintiff’s bid, with one mutually acceptable modification. Rat-cliff’s letter to plaintiff contains the following statements:
“All matters within the scope of this contract shall be governed by the necessary conditions of the specifications and by the provisions of my contract- with the Owner. You are to comply with all governmental regulations concerning the health and safety of your employees and the public.
“We expect to start at an early date on the work in the Gymnasium Building and to complete that part by June 1, 1973. Most of the work in the Classroom Building will have to be done between June 1, 1973 and August 15, 1973. Please mark your records so that you will plan to have men ready to complete the work as outlined above.”
The evidence shows that Mid-South did some painting in the gymnasium building in April and May, 1973, but that the painting work on that building was not completed by June 1, 1973, as required by the contract. Also, despite repeated demands by employees of defendant, Mid-South failed to begin the painting of other parts of the project by the middle of July, when it became apparent that it would be impossible even with due diligence for plaintiff to complete all of the painting work by August 15, 1973.
After plaintiff had failed to resume work on the gymnasium and to commence painting the rest of the project following repeated demands made by representatives of defendant to do so, Robert T. Ratcliff, an authorized employee of the defendant’s construction company, sent a “mailgram” to Mid-South on July 14, 1973, advising that “because of your failure to timely perform your subcontract with J. E. Ratcliff General Contractors reference Boyce High School job, it is terminated this date.” Plaintiff performed no more work on the school renovation project after that mail-gram was received by it.
Immediately after terminating the contract in that manner, Ratcliff engaged another painting contractor, Raymond Prest-ridge, to complete the painting work on the project. Prestridge began working immediately, employing six to eight painters who at times worked six and seven days a week, nine or ten hours a day. Despite what we consider to be diligent efforts on the part of Prestridge, the latter was unable to complete the painting work on the entire project by August IS, 1973, as required by the contract, but instead the painting work, was actually completed the latter part of December, 1973, while school was in session.
Mid-South filed this suit on December 12, 1974, to recover $3500.00, being the *378 profits which it allegedly would have earned under the subcontract if it had been permitted to finish the job. Defendant answered, alleging that Mid-South had breached the contract by failing to perform the painting work required by the subcontract, and it reconvened for damages in the amount of $12,610.20, being the additional cost allegedly incurred by Ratcliff in having the painting work completed.
At a pre-trial conference held on February 13, 1975, the case was scheduled for trial on May 27, 1975. When the case came up for trial on the last mentioned date, plaintiff filed a motion for a continuance, alleging as grounds therefor: (1) That plaintiff’s attorney had withdrawn as its counsel in this case and from the practice of law on April 30, 1975; (2) that important records of Mid-South had been subpoenaed by Ratcliff and by the United States District Court for the Western District of Louisiana, thus making it impossible for Mid-South to properly prosecute its original demand or defend itself in the reconventional demand without serious and undue risk; and (3) that the president of Mid-South had been subpoenaed by the United States District Court to appear before a Federal grand jury on May 28, 1975, and thus would not be able to be present during the trial of the instant suit.
The trial court denied plaintiff’s motion for a continuance, and the case was tried on its merits on May 27, 1975. Following that trial, the trial judge concluded that plaintiff Mid-South had breached the painting subcontract which had been entered into between the parties, and he accordingly rendered judgment in favor of Ratcliff and against Mid-South for the amount demanded in defendant’s reconven-tional demand. Mid-South appealed.

Motion for Continuance

Plaintiff contends, first, that the trial court erred in refusing to grant its motion for a continuance and that the judgment thus should be reversed and the case remanded for a new trial.
From the time the suit was filed until April 30, 1975, plaintiff was represented by the firm of Burnett, Harrison, Sutton and Walker, a professional law corporation, with Michael H. Wainwright, a member of that firm, handling the case for plaintiff. On April 30, 1975, Wainwright left that firm and he discontinued representing plaintiff in this suit on that day. Thereafter, although the same law firm, Burnett, Harrison, Sutton and Walker, continued to represent plaintiff, the files were turned over to Stephen V. Calloway, a member of the same firm, and Mr. Callo-way has handled the case for plaintiff since that time.
The record shows that the deposition of Harry Phillips, the superintendent of painters for plaintiff, was taken on March 12, 1975. The deposition of Malcolm Fu-qua, supervisor of the Boyce High School project for defendant, was taken on May 9, 1975, while plaintiff was being represented by its new counsel. And, the oral depositions of Dan Holt Hicks, James E. Ratcliff and Robert T. Ratcliff, all of whom occupied managerial positions with defendant construction company and had personal knowledge of the facts which are relevant to the issues presented here, were taken on May 14, 1975. Plaintiff’s new counsel, Calloway, was present and participated in-the taking of the last mentioned depositions.
Much of the relevant evidence was in the record before trial, therefore, and most of it was available to plaintiff’s new counsel, Mr. Calloway, as soon as it would have been available to Mr. Wainwright. The issues presented in this case are not unusually complicated. All of the files remained in the same law firm, so no difficulty was experienced by plaintiff’s new counsel in obtaining access to those files. In our opinion, plaintiff has failed to show *379 that it was prejudiced or harmed in any way by the withdrawal of its original counsel almost four weeks before the trial.
The second ground alleged by plaintiff to support its demand for a continuance was that important records of Mid-South had been subpoenaed by Rat-cliff for use in the trial of this case, and by the United States Attorney for the Western District of Louisiana, for use in a proceeding which was pending in the United States District Court.
The record shows that the above records were subpoenaed by the United States Attorney to be produced in the Federal District Court on May 19, 1975. The subpoena duces tecum issued in response to Rat-cliff’s demand ordered that the records be produced in the trial court on May 27, 1975, when this case was scheduled for trial. The records thus were available to plaintiff almost up to the date of trial. The president of plaintiff company testified, however, that he did not have access to the subpoenaed records prior to the trial, because the CPA firm which had possession of those records would not release them to plaintiff. The record does not show that plaintiff took any steps prior to the trial to get possession of its own records, or at least to examine them, by means of discovery procedure, by requesting a subpoena duces tecum, or by other appropriate legal proceedings.
It does not appear to us that the records which were subpoenaed are material to the issues presented here. In any event, however, the trial judge contacted an assistant United States Attorney before the trial began and arranged for plaintiff’s records to be made available at the trial. We find nothing in the record which indicates to us the plaintiff was prejudiced by being required to go to trial under those circumstances. Since plaintiff took no legal steps to get possession of its records prior to trial, and the evidence does not show that it has been prejudged by the lack of access to them, we cannot say that the trial judge erred in denying the motion for a continuance on that ground.
Plaintiff contends next that it was entitled to a continuance because Mr. Louie Howard, president of plaintiff company, could not be present after the first day of the trial. The record shows that the trial was completed in one day. Mr. Howard was present and he testified at the trial.
Finally, although not alleged in its motion for continuance, plaintiff contends that it was entitled to have the trial delayed because of the absence of a material witness, John M. Gingles, Jr.
At the beginning of the trial plaintiff’s counsel stated that he had subpoenaed some witnesses from Shreveport, but that the subpoenas had not been served. He nevertheless made arrangements for one witness, Gingles, a resident of Shreveport, to accompany him to the trial, but stated that this witness later changed his mind and refused to do so. The trial judge indicated that the case would be held open to take Mr. Gingles’ testimony at a later date. At the trial, however, plaintiff presented its case in chief and then rested, without requesting that the case be left open for the testimony of Gingles.
The evidence shows that Gingles worked for plaintiff as an “estimator” in May and June, 1973, and that he had some contacts with defendant, or his employees, while the Boyce High School renovation project was being conducted. Plaintiff contends that his testimony was essential to support its claim that defendant failed to supply color selections to plaintiff promptly, and that plaintiff was prejudiced in being compelled to go to trial without that witness.
The trial judge indicated at the beginning of the trial that the case would be left open for the testimony of Gingles. Plaintiff rested its case without reserving the right to obtain the testimony of Gingles later, however, and it indicated at the close of the trial that it was ready for the case to be decided by the trial court. It appears *380 to us that the testimony of Gingles, assuming that it would be most favorable to plaintiff, would be cumulative and would not alter the results of the trial. Under those circumstances, we hold that the trial judge did not err in denying plaintiff’s motion for a continuance on that ground, or in deciding the case at the conclusion of the trial.
The refusal of the trial court to grant a continuance on discretionary grounds will not be disturbed on review in the absence of a clear abuse of that discretion. Manley v. Manley, 203 So.2d 832 (La.App. 2 Cir. 1967); Evans v. The Travelers Insurance Company, 220 So.2d 117 (La.App. 3 Cir. 1969).
We find no abuse of discretion on the part of the trial court in this case in refusing to grant plaintiff the continuance which it sought.

On the Merits

Plaintiff contends that it was attempting to perform its obligations under the subcontract, but that it was prevented from doing so by the “inactions and failures” of defendant Ratcliff. Its principal argument is that Ratcliff failed to provide plaintiff with complete color data timely, that plaintiff could not perform its duties under the contract without that information, and that defendant’s failure to perform its duties thus was the cause of plaintiff’s delay.
The evidence shows that in April, 1973, portions of the renovated gymnasium of the Boyce High School Building were ready to be painted. At that time, employees of Ratcliff began calling on Harry Phillips, superintendent of painters for plaintiff Mid-South, requesting that he get painters on the job so the painting could be ■completed within the time specified in the contract. The entire gymnasium and the exterior of the classroom building were completed and were ready to be painted- in May, 1973. The contract called for the painting of the gymnasium to be completed by June 1, 1973. Phillips testified that his painters did some priming work in the gymnasium in April and the first half of May. The record shows that the only work which plaintiff did on the job was some priming work in the locker room area and on some doors in the gymnasium, and some priming work on the metal copping coves on the perimeter of the roof of the gymnasium. The evidence also shows that defendant had to remove and replace some doors in the gymnasium because he could not get plaintiff to paint them for several weeks after they were installed, and the doors absorbed water and warped due to the fact that they had not been painted.
Mid-South, apparently conceding that it did not begin painting the building early enough to enable it to complete the job within the required time, explains that it was unable to start work on the project earlier because of defendant’s delay in getting the color selections to plaintiff.
The record shows that defendant Rat-cliff sent a partial color selection for the gymnasium to Mid-South on May 30, 1973, and that he sent a second color selection to plaintiff relating to classrooms on June 18, 1973. Mid-South acknowledges that it received the partial color selection on May 30, and that it received a letter purporting to transmit other color selections on or about June 18. It contends, however, that color selections were not enclosed with the last mentioned letter. Regardless of whether color selections were enclosed in the second of those two letters, the evidence shows that color selections were available to plaintiff at the job site and in the office of plaintiff, and that the information which plaintiff needed relating to colors was readily available to it by merely going to the work site or to the office of the general contractor. Plaintiff apparently made no effort to get these color selections. We note also that although plaintiff maintains that it could not do even the *381 priming until it received the color selections, it actually did some priming work before the time it admits having received those selections. And, the evidence indicates that it did no further priming or painting after it admittedly received the partial color selections on May 30.
Mr. Gingles, estimator for Mid-South, wrote a letter to defendant Ratcliff on July 3, 1973, requesting “plans and specifications” for the project, “so that we can plan and schedule our portion of the work.” No mention was made in that letter of color selections, and plaintiff made no explanation as to why the bulk of the painting work had not been completed, or even started, by that time. Defendant promptly forwarded a copy of the plans and specifications, as requested, although they had been available to plaintiff at the job site long before that time. No further painting work was performed on the job thereafter, and on July 14, 1973, defendant sent the above mentioned mailgram to plaintiff terminating the contract.
Mr. Howard, president of plaintiff company, was unable to explain why plaintiff waited until July 3, 1973, to ask for the plans and specifications, that being long after a major part of the painting work should have been completed. And the testimony of Robert Ratcliff and defendant’s supervisor of construction is convincing to the effect that plaintiff never informed defendant that it needed or had not received the color selections.
Phillips, plaintiff’s supervisor, testified that very little painting work had been done on the job prior to the time the contract was terminated, “probably no more than five or six man days work.” He also estimated that from ten to twelve weeks would be required to complete the painting called for by the subcontract. It is apparent from his testimony that the painting work on the classroom buildings could not have been completed by August 15, as provided in the contract, even if plaintiff had started working when it first requested the “plans and specifications” on July 3, 1973.
We have already pointed out that Mr. Prestridge, who was engaged by defendant to complete the painting, was not able to finish it until some time in December, 1973, although we find that he worked diligently in attempting to do so. Plaintiff had some financial troubles while this subcontract was in effect, and it also experienced some difficulty in getting painters to work on the project. Those factors, none of which were attributable to defendant, may have contributed in some measure to plaintiff’s failure to begin work on the project timely. Whatever the reason, however, it is clear that plaintiff delayed the painting work for such a long period of time that it would have been impossible for it to have completed the work timely, even if it had begun to work diligently on July 14 when the subcontract was terminated.
The trial judge concluded that:
“The Court finds as a fact that the Plaintiff had available to him color selections which he could have used and with due diligence he could have obtained further color selections in time to perform this contract.”

“ . . . . This was a contract in which time was of the essence. The School Board and RATCLIFF both were attempting to complete this job prior to the beginning of the school year of 1973, which would be in September. According to the evidence MID-SOUTH did not have men on the job site despite repeated efforts by RATCLIFF, his foreman, Mr. Fuqua and his assistant, Mr. Hicks.”
* * * * * *
“The Court is of the opinion that Mr. Ratcliff was justified in cancelling this contract. Time was of the essence in this contract and he was having great difficulty getting the subcontractor, *382 MID-SOUTH, to place painters on the job to complete the project . . . ”
******
“. . . The Court finds as a fact the Contract was breached by MID-SOUTH when they failed to perform the work as they were obligated to do, and that Mr. Ratcliff’s cancellation of the contract was justified.”
We agree with the trial judge that the subcontract was breached by Mid-South, and that defendant was justified in terminating that contract.
Plaintiff contends, however, that the trial judge erred in awarding damages to Ratcliff, since there was no . active breach of contract and plaintiff was not put in default. To support that argument, plaintiff quotes and relies on the following provisions of LSA-C.C. art. 1933 :
“Art. 1933. When the breach has been passive only, damages are due from the time that the debtor has been put in default, in the manner directed in this chapter.
“The rules contained in this and the preceding articles, however, are subject to the following exceptions and modifications :
“1. When the thing to be given or done by the contract was of such a nature, that it could only be given or done within a certain time, which has elapsed, or under certain circumstances, which no longer exist, the debtor need not be put in legal delay to entitle the creditor to damages.”
The trial judge found that time was of the essence of this contract between the parties, and we think the evidence supports that finding. The specifications for the work, the contract between the School' Board and Ratcliff, and the letter agreement between Ratcliff and Mid-South provide that the work on the gymnasium was to be completed by June 1, and that the work on the Classroom Building was to be completed by August 15, 1973. The work was being performed on a school building, and it was of great importance that it be completed during the summer months, before school resumed in the fall.
Since time was the essence of the contract, the requirement of a putting in default is not necessary. Payne v. Foster, 26 So.2d 237 (La.App.Orl.1946); Brown Carriage Co. v. Coreil, 7 La.App. 411 (1928); McMillan v. Mills, 3 La.App. 9 (1925).
Mid-South argues, however, that a putting in default was necessary in this case, because defendant chose to terminate the subcontract prior to its completion date, that is, prior to August 15, 1973. It points out that Paragraph 1, of Article 1933 of the Civil Code, dispenses with putting in default only when “the contract was of such a nature, that it could only be given or done within a certain time, which has elapsed . . . ” Its argument is that the time for completing the subcontract had not elapsed on July 14, 1973, when defendant terminated that agreement, and that Ratcliff thus was not relieved of the requirement that plaintiff be put in default.
We find no merit to that argument. The time for completing the painting of the gymnasium elapsed on June 1, 1973, several weeks before the contract was terminated. Since the time for performing a substantial part of the contract had elapsed, LSA-C.C. art. 1933(1) relieved Ratcliff of putting plaintiff in default for that reason alone. Another reason why it was necessary to put plaintiff in default is that the contract provides that all of the remainder of the work was to be completed by August 15, 1973. That provision necessarily implies that the contractor would begin the work which it agreed to perform early enough to at least make it possible for that work to be completed by the agreed deadline. We think plaintiff’s failure to commence work on the remainder of the project in time to enable it to complete that work by August 15, 1973, constituted a breach of the contract by plaintiff, and that defendant thus had the right to terminate the contract on July 14, 1973.
*383 Finally, plaintiff argues that it was entitled to seven days written notice of the default before defendant could terminate the subcontract. It points out that the letter agreement between the parties stipulates that all matters within the scope of that contract shall be governed by “the provisions of my contract with the owner.” The contract between the School Board and Ratcliff provided that in the event the contractor fails to perform, the owner may terminate the employment of the contractor and take possession of the site after giving the contractor seven days written notice.
One answer to that argument is that there is no privity of contract between the School Board and Mid-South. The School Board, as owner, thus is not required to give Mid-South, a subcontractor, any notice at all in the event the latter defaults. Neither the principal contract between the School Board and Ratcliff, nor the letter agreement between the parties to this suit, can logically be interpreted as requiring the principal contractor, rather than the owner to give such a notice to the subcontractor, before the principal contractor could “take possession of the site.” The principal contractor has possession of the site despite a default by a subcontractor.
We find no error in the judgment of the trial court which rejects plaintiff’s demands, and condemns Mid-South to pay Ratcliff the damages which the latter sustained as a result of the breach of contract by Mid-South.
The evidence shows that Ratcliff paid Prestridge $12,610.20 more to finish the painting work than it would have owed to Mid-South under the subcontract involved in this suit. The trial court correctly awarded that amount to Ratcliff as the damages he sustained.
For the reasons assigned, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant, Mid-South Contractors, Inc.
Affirmed.